IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **JOHN KOTTENSTETTE and**<br>**YESSI KOTTENSTETTE** | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. _____** |
| | § | **JURY TRIAL DEMANDED** |
| **CITY OF CONROE, TEXAS and** | § | |
| **RALPH HORNE, INDIVIDUALLY** | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFF'S ORGINAL COMPLAINT**

TO THE HONORABLE U.S. DISTRICT JUDGE:

Plaintiffs JOHN KOTTENSTETTE and YESSI KOTTENSTETTE file this Original Complaint against Defendant CITY OF CONROE, TEXAS and RALPH HORNE, INDIVIDUALLY, and would show the Court and Jury the following in support thereof:

I.
**PARTIES**

1. Plaintiffs JOHN KOTTENSTETTE (hereinafter "John") and YESSI KOTTENSTETTE (hereinafter "Yessi") are citizens of Texas and reside in Harris County, Texas.

2. Defendant CITY OF CONROE, TEXAS (hereinafter "Defendant City" or "City") is a municipality located in Montgomery County, Texas, that operates the Conroe Police Department, and may be served through its Mayor Duke W. Coon, at 300 W. Davis, Conroe, Texas 77301 or wherever he may be found. *Service is hereby requested at this time.*

3. Defendant R. HORNE, IN HIS INDIVIDUAL CAPACITY, (hereinafter "Horne") was, at all times material to this suit, an officer employed by the Conroe Police Department. Horne's

1

acts complained of herein arise from his  conduct while acting under color of state law and as a law enforcement officer with the Conroe Police Department.  Defendant may be served with summons at his place of employment, Conroe Police Department, 2300 Plantation Dr., Conroe, TX 77301 or wherever he may be found.  *Service is hereby requested at this time.*

## II.
## JURISDICTION AND VENUE

3. Plaintiffs bring this lawsuit under the Fourth Amendment, as incorporated through the Fourteenth Amendment, to the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. § 2201.

4. This Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs bring this lawsuit under the U.S. Constitution and federal laws. This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) because Plaintiffs seek to redress the deprivation of federal constitutional rights under the color of state law or custom.

5. Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) as the events giving rise to Plaintiffs' claims occurred in this district.

## III.

## FACTS

6. February 14, 2023, Yessi returned home and found John unresponsive in their bed. Frighted, Yessi got John into her car and drove him to the Emergency Room at HCA Houston Healthcare,  504 Medical Center Blvd, Conroe, Texas (hereinafter "HCA Conroe").

7. When reaching HCA Conroe, Yessi drove to the ambulance unloading, and shouted for help. John was taken from the car by HCA personnel, and moved to a hallway in the triage area.

2

8. On arrival at HCA Conroe, Yessi immediately and concisely gave all HCA Conroe personnel present the information that was needed to treat John's acute emergency. She said that, when she came home, she found John unresponsive in their bed, she described the substances John may have ingested, and she let them know that John had vomited in the car on the way to the hospital. Yessi felt and requested that John needed his stomach pumped, IV fluids, and charcoal. Yessi had urgent care training and quite a number of years of experience in acute care from working in an ER vet clinic.

9. HCA Conroe personnel asked her nothing related to information needed to treat John, but grilled her *why* John may have drank too much or taken too much medication. They repeatedly asked Yessi if she and John had any "problems." Yessi was surprised, shocked, irritated, and concerned that, rather than treat John's acute medical condition, HCA Conroe personnel were fixated on "problems" she and John may have had. To placate this obsessive curiosity, and to hopefully get on with John's needed treatment, Yessi said, "Of course we have problems, we have a lot of problems."

10. Yessi never told anyone at HCA Conroe that John had "suicidal ideations" or even mentioned anything related to the topic of suicide.

11. An HCA Conroe physician, presumably Dr. Alan Moy, was present as Yessi provided the information described above.

12. This was the only time Yessi or John were seen or had any contact with any HCA Conroe physician. After Plaintiffs' initial arrival at HCA Conroe, no HCA Conroe physician ever again saw or spoke with either John or Yessi.

13. HCA Conroe personnel took John's blood a short time after John was taken to the triage area.

14. Roughly 2 hours after John's arrival at HCA Conroe, while he was still in the triage area, a nurse began for the first time to monitor John's vitals. Prior to that, John had received no medical attention other than the blood draw. His blood pressure was not even taken. John remained non-responsive during all this time.

15. Yessi was told when John's initial blood was drawn that treatment would not begin until the blood results were available.

16.  Yessi was apprehensive about this delay. She felt that she had given HCA Conroe enough information that coupled with  John's condition warranted starting an IV, taking an MRI of John's brain, pumping his stomach, and administering charcoal.

17. When the nurse began the monitoring of John's vitals, which was about 2 hours after Plaintiffs' arrival, the nurse told Yessi that HCA Conroe had lost the  blood they had taken from John.

18. The nurse said HCA Conroe would need another blood draw and a urine sample.

19. As time passed, John's clothes were changed by HCA personnel who replaced them with an orange jumpsuit.

20. As more time passed, John was transferred from the triage area to a room within the ER.

21. At roughly  6:30 PM—more than two and half hours after Plaintiffs arrived at the ER— a  HCA Conroe staff member, who was not a physician, told Yessi that they were going to collect

a urine sample from John by inserting a urinary catheter in his penis. Yessi was told that a secondary benefit of the catheter insertion was that the pain would probably rouse John awake. Yessi reluctantly agreed, feeling the discomfort of the procedure may well jolt John awake. Yessi knew of the procedure's high level of discomfort from her vet clinic training and experience. It was a procedure that would not be performed on an animal at the vet clinic without sedation.

22. HCA Conroe's attempted catheter insertion was a failure. Again and again they pushed the catheter into John's penis. They retrieved no urine. They left John's penis inflamed and bloody.

23. The HCA Conroe personnel who performed the failed procedure asked Yessi if John had gotten up to urinate. Incredulous, Yessi said no. John had been and remained non-responsive. Of course, he did not get up to urinate. Urine could not be retrieved because John, who had still received no fluids, had no urine to retrieve. John was severely dehydrated.

24. The multiple failed efforts to push the tube into John did not wake him up, but he did groan and have involuntary muscle spasms.

25. Given the need to get John to a hospital urgently, Yessi had to bring their two children along when she took John. After the urinary catheter ordeal, Yessi needed to get the children home and settled.

26. When Yessi returned to the hospital, John was still not awake.

27. John started to awaken about a half an hour after Yessi returned to the hospital.

28. As John gradually awakened and sought to regain his bearings, he felt excruciating pain from his penis and saw the blood. Trying to orient himself, he spoke with Yessi, telling her about his pain, seeking help from her to understand what had happened.

29. After John had awakened,  an HCA Conroe nurse entered the room. She said HCA Conroe now wanted to start an IV and take an MRI of the brain.  John declined.

30. John had been left dehydrated and unconscious for more than 6 and half hours with no treatment at all. His penis was painful and bloody from the urinary catheter failures. Blood had been taken from him twice because the first draw was lost. John wanted nothing from HCA Conroe and he and Yessi wanted to leave HCA Conroe. They, however, were told they could not leave, and no reason was given.

31. An HCA Conroe security guard entered the room. Plaintiffs now know the security guard was Justin Thomas Branch (hereinafter "Branch"). Plaintiffs now know Branch was an off-duty Precinct 1Montgomery County Deputy Constable, moonlighting as a security guard.

32. When Branch entered John's room, he announced that John could not leave the hospital until (1) John gave a urine sample, (2) John put the orange jumpsuit back on, and, after complying with both those requirements, (3) John was to be seen by a HCA Conroe psychiatrist for an evaluation.

33. These orders were all given to John by Branch, a security guard. No physician or any other HCA Conroe medical staff ever discussed or explained  any these "discharge barriers." No HCA Conroe physician ever spoke Plaintiffs about any of these things.

34. John told Branch that he could not urinate, and asked Branch for water. Branch refused the request for water, and demanded that John urinate, telling John, "We can do this the easy way or the hard way." John and Yessi both explained that John had been given no fluids and John had no urine to give.

35. For about an hour, Branch entered John's room every 10 or 15 minutes. demanding a urine sample.

36. With each visit, Branch's anger increased. He spoke louder and more forcefully each time.

37. No matter how demanding or threatening Branch became John simply had no urine to give. He was fluid depleted. Branch continued to deny John water.

38.  John and Yessi were stunned at John's imprisonment at HCA Conroe.

39. John tried contacting the State Medical Board to complain and seek help.

40. Yessi anxiously tried searching on the internet to find anything to explain what was happening to them.

41. Around 11 PM, about 7 hours after Yessi brought John to HCA Conroe in need of immediate medical care,  a nurse handed Yessi a batch of papers, and Yessi sat on John's bed to read them.

42. Within a minute or so of Yessi receiving the batch of papers, Branch and three other similarly dressed men entered the room. Yessi and John thought they were all HCA Conroe security guards.

43. Defendant Horne, who Yessi and John now know was with the City's police, approached John's bed. When Horne and the other City police officers came into John's room, both John and Yessi thought they were security guards, and none of them ever identified themselves as police officers or said why they were there.

44.  John began to explain that he had called the State Medical Board.

7

45. Before Horne with other City police entered John's room to arrest him, the only person Horne spoke with about Plaintiffs was Branch.

46. Horne did not speak with or attempt to speak with any HCA Conroe physician or other medical personnel before he and the other armed City officers entered John's hospital room.

47. When Horne and the other Conroe police entered John's hospital room, John was in his hospital bed in the orange jumpsuit HCA Conroe had place him in. Yessi was sitting on the side of the bed, beginning to read from papers she had just received from a HCA nurse.

48. John and Yessi thought the papers were for John's discharge from HCA Conroe to return home.

49. Horne never told John or Yessi that he was a police officer.

50. Horne never told John or Yessi why he entered John's room.

51. Horne never told John or Yessi that he suspected them of any unlawful conduct. John and Yessi posed no danger to themselves or others when Horne entered John's room. Nothing about John or Yessi's conduct created a need for or justified any "split second" law enforcement action.

52. Horne did not tell John or Yessi that either of them were under arrest or that he had any intention of arresting either of them. Horne never told John that he was going to handcuff him. John nor Yessi did not say or do anything that would provide Horne or any other reasonable law enforcement officer a justification for handcuffing him.

53. After entering John's hospital room, Horne did not seek any information from John or Yessi that would support any reasonable suspicion that John or Yessi had committed a crime or may a crime or that John or Yessi posed any risk of danger to themselves or others.

54. The moment John to began to speak to Horne, Horne interrupted and ordered John to get out of his hospital bed. John complied.

55.. As John stood up, Horne immediately grabbed John and started to handcuff him.

56. Shocked by Horne's sudden aggression, John instinctively reached for his bed rail with one arm. Horne, Raynor, and Branch immediately tackled John, and Yessi was physically pushed away from John.

57. Horne and other officers tugged and yanked John from the bed, slung him to the ground face first, and, while other officers sat on John's back, Horne handcuffed John, and hit John in the head multiple times.

58. After being assaulted by Horne and other City police, John was taken from his room by Horne and other City police who humiliated John by parading him handcuffed and wearing an orange jumpsuit in front of all onlookers. John was jailed, put in a holding with others, and denied medical care. The City permitted the publication of John's mugshot, and this mugshot remains widespread online to this day. Defendants' misconduct as described in this Complaint has and is doing considerable damage to John's reputation, and has caused economic damage to his vocation as a licensed doctor of veterinary medicine and the business of the clinic at which he works.

59. Based on false reporting by Horne, John was charged with public intoxication and resisting arrest. Both charges were later dismissed. The expunction order on the public intoxication charge entered by the 457th District Court of Montgomery County Texas Cause No. 23-10-15495 found no probable cause at the time of the dismissal. found the charge was not based on The expunction order on the public intoxication and an expunction orders were entered.. The expunction order on the resisting arrest charge entered by the 284th District Court of Montgomery County Texas Cause No. 23-10-15496 also found no probable cause at the time of the dismissal.

60. Yessi never touched or interfered with the officers. However, City officers ordered the seizure of her phone, had her physically pushed out of the room, slammed the door to the room after she was forced out,  and closed the blinds to John room. This happened to prevent Yessi from witnessing or video taping the assault on John. As John was being manhandled by Horne and other City police and in fear of his life, he pleaded with Yessi to video what was happening to him. This plea resulted in the City police misconduct set out in this paragraph. When John was removed from the room, Yessi was detained so that she could not follow John out. When she began to walk out, City police followed her, and further detained her and refused to tell her where John was being taken.

61. City police officers seized Yessi's phone.

62. City Police forcefully pushed Yessi out of the room as they beat John, and shut the blinds to the room to prevent her from seeing what they were doing to John. When Yessi tried to open the blinds from the outside, City police would immediately slam them shut.

63.  When she walked down the hall, she was pursued by City police officers, and told she needed to remain for questioning and to give a statement.

64. Horne falsely reported that John threatened him with Horne's flashlight, and Horne feared for his safety.

65. The force of this law enforcement action defies rational explanation, and was unreasonable and excessive.

66. Horne, after hitting John, had some of John's protected health records seized..

67.  Horne had no constitutionally justified basis for restraining, arresting, seeking charges, or jailing  John. He had no warrant, no probable cause, or reasonable suspicion to support any of this misconduct.

68. Horne gave statements[1] to support charging John with crimes and to support Defendants' misconduct, d the use of the statement justify or support any of the City police's conduct as described in this Complaint. Exhibit A-DA report at p. 3 and Exhibit A-Arrest Report at pp.1-2. The Horne statements are replete with materially false representations and omitted material information. Without these misrepresentations and ommissions, Horne's statements state no facts that would  support a reasonable suspicion that John or Yessi had done anything unlawful or planned to do anything unlawful. Without these misrepresentations and ommissions, Horne's statements state no facts to support a reasonable suspicion that John or Yessi posed any danger to themselves or others. Without these material misrepresentations and omissions, Horne's statements state no facts that justify Defendants' misconduct as described in this Complaint. The material misrepresentations and omissions in Horne's statements and Horne's other misconduct set out in this Complaint are not protected by and negate the assertion of Qualified Immunity. It has long been well established law that a law enforcement officer cannot lawfully use false information to support or justify any of types of misconduct factually alleged in this Complaint. The material misrepresentations and ommissions in Horne's statements include the following, and used in both Exhibit A Horne statement unless otherwise indicated in the following list:

A. The Horne statements omitted the material fact that Branch, who was Horne's exclusive source of information about John or Yessi before Horne entered John's hospital room to arrest him,  did not witness and was unable to personally verify the information he reported to  Horne.

---

[1] Exhibit A as furnished to Plaintiffs' include two reports, and Horne makes statements in both. The first Horne statement is in the 8 page document that is headed  "Montgomery County District Attorney, Deputy Report for Incident 23020577," and this document will be identified in this Complaint as Exhibit A-DA Report. The second document is 3 pages in length and headed "Conroe Police Department Individual Arrest Report," and this document will be Identified in this Complaint as Exhibit A Arrest Report. The Horne statements are located at Exhibit A DA Report at p. 3 and Exhibit A Arrest Report at pp.. 1-2.

B. The Horne statements made the materially false representation that Yessi said that she brought John to HCA Conroe because she had found John "highly intoxicated" and feared that he "may have tried to overdose."  Yessi never said this. To the contrary, Yessi, on arrival at HCA Conroe, told the medical personnel present that she had found  John unconscious in their bed and brought him to the FR because he needed emergency health care.

C. The Horne statements made the materially false representation that while in the hospital John was "forgetful" and things needed to be repeated to him. It misrepresents completely John's actual emotional and mental state while in the hospital. John  arrived at the hospital unconscious. John remained unconscious for about 7  hours. John had only started to regain consciousness less than two before Horne entered John's room to arrest him. When John first began to awaken, he did not know where he was or what had happened to him, and spoke with Yessi to orient himself. When he first awoke, his penis was excruciatingly painful and bloody. When Horne entered the room to arrest John, John was alert and sitting in his bed waiting to be discharged.

D.  Horne's statements omits the material facts that about an hour before Horne entered John's room to arrest him, Branch barged into John's room, telling John  and Yessi that they could not leave the hospital until John changed back into an orange jumpsuit, gave a urine sample, and had a psychiatric evaluation. And Branch told John and Yessi that John could not have a psychiatric evaluation until John gave a urine sample.

E.  The Horne statements omitted the material facts that John had been given no fluids while in the hospital, was severely dehydrated, and could not urinate,

F. The Horne statements omitted the material fact that Branch refused John's request for water.

G. The Horne statements omitted the material fact that, after Branch first demanded that John provide a urine sample and denied John's request for water, Branch entered John's room every 10 to 15 minutes demanding that John provide a urine sample.

H. The  Horne statements omitted the material fact that Branch threatened John, saying that John could give a urine sample "the easy way or the hard way."

I. The Horne statements include the materially false representation that John had been verbally abusive to HCA Conroe staff. Neither John nor Yessi were verbally abusive to any HCA Conroe staff despite HCA's failure to provide John any medical treatment.

J. The Horne statements include the materially false representation that Yessi had "recanted her story."  This is untrue.  Yessi never told a "story." Instead, Yessi, as described above, concisely gave the HCA Conroe staff then present the information needed to treat John emergently and made specific treatment requests. Yessi never "recanted" anything she actually told the HCA Conroe staff.

K. The Horne statements omitted the material fact that Horne never spoke with any member of the medical HCA Conroe staff about anything Branch had told him before he entered John's room to arrest him.

L. The Horne statements omitted the material fact that Horne never spoke with John or Yessi about anything Branch had told him before he entered John's room to arrest him.

M. The Horne statements omitted the material facts that Horne never identified himself as a law enforcement officer to John or Yessi at anytime.

N. The Horne statements omitted the material fact that Horne never told John or Yessi why he or the other City police entered John's room.

O. The Horne statements omitted the material fact that Horne never said to John or Yessi that he intended to restrain or arrest John.

P. The Horne statements omitted the material fact that John nor Yessi posed any threat at all to Horne, the armed City police who accompanied Horne, Branch, or anyone else when Horne and the others entered John's room.

Q. The Horne statements include the materially misleading representation that Horne "elected to move John to the ground." The fact is that Horne and other City police yanked John from his bed, threw him face first on the ground, sat on his back and legs, and hit him.

R. The Horne statements include the materially false representation that Horne "placed" John on the ground. John was thrown to the hospital floor landing on his face.

S. The Horne statements include the materially false representation that John was "squirming" on the hospital floor "to get to attempt to regain his own control [sic]." John had been thrown face first to the ground, his right arm was handcuffed, City officers were on John's back holding him down, Horne began hitting John in the face. John was not seeking to gain control. John was struggling for his life. He had no idea who his attackers were, why they were assaulting him, and whether or not they planned to kill him or continue beating him. Horne never identified himself as a police officer or said a word to explain what he and other City police were doing to John or why they were doing it.

T. The Horne statements include the materially false representation that John "reached behind [Horne's] back, "removed [Horne's] flashlight from [Horne's] belt, and [Horne] feared that John may use it as an improvised impact device against the officers." Factually, Horne and at least two other armed City officers controlled John who was pinned face down on the hospital room

floor. John's right hand was handcuffed. One of these officers had his knee on John's back, and used all his body weight to prevent John from any appreciable movement and restrict his ability to breathe. Horne and at least one other City officer were able, with John pinned down, to do whatever they wished to John, including hitting him multiple times in the head. John had no ability to pose any reasonable threat to Horne or any City officers. Horne's alleged "fear" that John would use an "improvised impact device" to inflict harm on anyone is, putting it mildly, false.

U. The Horne statements include the materially false representation that John attempted to bite him "as [Horne] felt [John's] teeth brush the skin on the inside of [Horne's] left forearm." John made no effort at all to harm or inflict any pain his attackers.

69. Given that, before entering John's room to arrest him for public intoxication, Horne had never seen John or Yessi, never asked to talk with Yessi, never spoke with any HCA medical staff, and relied exclusively and without question on Branch's false reporting, Horne and the City police officers entry into John's room and their misconduct thereafter violated John and Yessi's Fourth Amendment rights protecting them from wrongful seizure and the use of unreasonable and excessive force.

70. Horne and the other City officers who accompanied Horne violated John's Fourth Amendment rights when they entered his room. They had no warrant, no probable cause, and no reasonable suspicion of criminal conduct.

71. Horne's initiation of the handcuffing of John violated the Fourth Amendment. He had no warrant, no probable cause, no reasonable suspicion of criminal conduct, and John exhibited no conduct that justified John's physical restraint. John was in a hospital bed, posing no threat to anyone.

72. Horne's arrest of John violated John's Fourth Amendment rights. Horne had no warrant, no probable cause, and no reasonable suspicion of criminal conduct.

73. Horne's successful efforts to have John  charged with crimes was based on Horne's false reporting which  violated John's Fourth Amendment rights.

74. Horne's removing John from a hospital room and jailing him in general population violated John's Fourth Amendment rights.

75. Horne and the other City police use of force on John and Yessi violated their Fourth Amendment rights. Horne hit John in the head multiple times while he and other City officers held John down face first on the floor. This unreasonable and excessive force violated John's Fourth Amendment rights.

76. City police seized Yessi's phone, restrained her movements, pushed and shoved her out of John's room to prevent her from taping or witnessing what Horne and other City police were doing to John, and this violated her Fourth Amendment rights that protected her from wrongful seizure and use of unreasonable force and her First amendment rights as well.

77. Horne's statement confirms that Johm's protected health information was seized and in Horne's possession at some point after John had been taken from the hospital in  violation of John's Fourth Amendment.

78. The unconstitutional conduct of Horne and the 6 other City officers who responses cause injury to both Plaintiffs, including mental anguish, humiliation, and damage to reputation that has resulted in great economic loss to both Plaintiffs.

79. An event with so many constitutional violations that involved some many City officers and occurred in front of so many people factually evidences that Defendant City policy makers knowingly or with deliberate indifference failed to ensure that its police had any training on the important subject interfacing with citizens who  are patients in a hospital setting and in particular in an emergency room setting. Not a single City officer suggested, for example, that they should at least speak with someone on the hospital staff before deciding to arrest a patient based on hearsay from a security guard. This failure to train was the moving force in an uncalled for cascade of constitutional violations that caused Plaintiffs severe damage.

## CAUSES OF ACTION

### CLAIM I
### VIOLATION OF THE FOURTH AMENDMENT BY HORNE

80. Plaintiffs incorporate all factual allegations made in this Complaint.

81.The Fourth Amendment, as incorporated by the Fourteenth Amendment, guarantees everyone the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U. S. CONST. AMEND. IV and U. S. CONST. AMEND. XIV. Such violations are actionable pursuant to 42 U.S.C. Sections 1983 and 1988. Unreasonable seizures include detention or arrest without warrant or probable cause and use of excessive force.

82. The detention, arrest, the criminal charges, and jailing of John Kottenstette all lacked Constitutional justification, and, therefore, violated his well established  Fourth Amendment rights. Any reasonable law enforcement officer would have known this.  Horne, acting under the color of law, violated John Kottenstette's Fourth Amendment rights when he. without warrant or probable cause, committed the constitutional violations described above, including the following:

A. Entered a hospital emergency room with other City other law enforcement officers;

B. Without identifying himself or his purpose in the hospital room  ordered John out of the hospital bed, initiated handcuffing and arresting John,  and with the aid of other City officers drug John off the bed, slammed John face first on the floor, pinned him to the floor, handcuffed him, and hit him multiple times in the head'

83. Horne's unconstitutional  misconduct as described in this Complaint caused injury to both Plaintiffs.

84. The defense of qualified immunity under the circumstances described in this Complaint is not available for Defendant Horne.

## CLAIM

## VIOLATION OF THE YESSI KOTTENSTETTE FIRST AMENDMENT RIGHTS

85. Plaintiffs incorporate all factual allegations made in this Complaint.

86. City police seized Yessi Kottenstette's phone, physically shoved her out of John's room, and shut the blinds for purpose of preventing Yessi from videoing what was being done to he husband in violation of First Amendment protected speech rights.

86. This constitutional violation caused Yessi mental aguish damages and resulted in spoliation evidence.

## CLAIM III

## §1983 *MONELL* CLAIM AGAINST CITY OF CONROE, TEXAS, UNDER FEDERAL LAW

87. Plaintiffs incorporates by reference all of the foregoing and further alleges as follows:

88. The City permitted and ratified practices that were the moving force in the violations of Plaintiffs' constitutional rights.

89. Specifically the City permitted and ratified the following practices of Conroe police officers each of which violated the 4th Amendment to the United States Constitution as incorporated by the 14th Amendment and were the moving forces in the violation of Plaintiffs constitutional rights. :

    A. Entering a patient's hospital room without any constitutionally viable justification for doing so.

    B. Arresting patients and detaining their guests without any constitutionally viable justification for doing so.

    C. Using unreasonable and excessive force on hospital patients and their guests.

    D. Seizing patients' medical records without constitutionally viable justification.

90. Defendant City failed to provide any training on the constitutional requirements for detaining, arresting, and charging of emergency room patients and their guests.

91. Defendant City failed to provide any training on the constitutional requirements seizing patient's medical records.

92. Defendant City failed to provide any training on the constitutional requirements for detaining, arresting, jailing and charging of emergency room patients.

93. Defendant City failed to provide any training on the constitutional requirements for and limitations of the use of force.

94. Defendant City failed to provide any training on the constitutional limitations on First Amendment Protected speech.

95. The Defendant City knew its police officers would commonly interact with private citizens in circumstances in which those citizens, while having committed no wrong, were under stress for a host of possible reasons. The Defendant City's failed to train its officers that, when faced with these encounters, violating constitutional rights is simply not an option. This failure was intentional or the result of conscious indifference.

96. Defendant's policymaker for all matters related to the Conroe Police Department was the Chief of Police.

97. Each of the unconstitutional practices set out in this Complaint was actually known to its policymaker or resulted from the policymaker's deliberate indifference. Accordingly, these practices made it highly predictable that the particular violations alleged in this Complaint would result.

**V.**
**JURY DEMAND**

98. Pursuant to Federal Rule of Civil Procedure 48, Plaintiff hereby requests a jury trial.

**VI.**
**PRAYER FOR RELIEF**

59. Accordingly, Plaintiffs ask for the following relief:

A.    Entry judgment for Plaintiffs and against Defendants Horne, individually, and the City for compensatory damages.

B.    Plaintiffs suffered anxiety, fear, anger, and depression because of the acts of the Defendants, and therefore, seeks damages for mental anguish past and future as well as the pain and suffering past and future.

C. Plaintiffs should be awarded punitive damages as Defendants' misconduct was done knowingly or with conscious indifference to Plaintiffs' constitutional rights and the acts were extreme and outrageous and shocking to the conscious.

D. Plaintiffs should  be awarded recover attorney's fees and costs to enforce her Constitutional rights under U.S.C. Sections 1983 and 1988.

E.  Plaintiff should be awarded, at a minimum, nominal  damages for the violations of their Constitutional rights.

F . Plaintiffs should be awarded pre and post judgment interest  at the highest rate allowable under the law; and,

G. Plaintiffs should be awarded  all other relief to which they  are justly entitled.

Respectfully submitted,

**/s/ Jack E. Urquhart**
**Jack E. Urquhart**
State Bar No. 20415600
Email: jack.urquhart47@gmail.com
Jack E. Urquhart Attorney At Law
1302 Waugh Drive, No. 880
Houston, TX 77019
(832) 723-2201

**ATTORNEY FOR PLAINTIFFS**
**JOHN KOTTENSTETTE and**
**YESSI KOTTENSTETTE**